**UNITED STATES of America,**
**Appellee,**

v.

**Luke JONES, Defendant–Appellant.**

**Docket No. 03–1626.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 18, 2005.

Decided: June 30, 2006.

138

Alex V. Hernandez, Assistant United States Attorney, Bridgeport, CT (Kevin J. O'Connor, United States Attorney for the District of Connecticut, Alina P. Reynolds, William J. Nardini, Assistant United States Attorneys, Bridgeport, CT, on the brief), for Appellee.

Brendan White, New York, N.Y. (White & White, New York, NY, on the brief), for Defendant–Appellant.

Before KEARSE, MINER, and HALL, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Luke Jones ("Jones" or "Luke") appeals from a judgment entered in the United States District Court for the District of Connecticut convicting him, following a jury trial before Alan H. Nevas, *Judge,* on one count of conducting an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count One); one count of RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (Count Two); two counts of conspiracy to distribute and to possess with intent to distribute narcotics, in violation of 21 U.S.C. § 846 (Counts Five and Six); and two counts of conspiracy to commit violent crimes—to wit, murder—in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Counts Eighteen and Twenty–One). Jones was sentenced principally to concurrent terms of life imprisonment on Counts One, Two, Five, and Six, and 10 years' imprisonment on Counts Eighteen and Twenty–One. On appeal, he contends primarily that his convictions on Counts One, Two, and Eighteen should be reversed because the evidence was insufficient; that on any counts on which his conviction is not reversed, he is entitled to a new trial because his trial counsel rendered ineffective assistance and because of retroactive misjoinder; and that as to any count as to which his conviction is affirmed, he should be resentenced in light of *United States v. Booker,* 543 U.S. 220, 244, 259, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). For the reasons below, we find no basis for overturning Jones's conviction on any count; we remand to allow the district court to determine, in accordance with *United States v. Crosby,* 397 F.3d 103, 117 (2d Cir.2005) *("Crosby "),* whether the sentences imposed would have been nontrivially different if, at the time of sentencing, the Sentencing Guidelines ("Guidelines") had been advisory.

## I. BACKGROUND

The present prosecution arose from an investigation of narcotics trafficking in the P.T. Barnum Housing Project ("Barnum")

in Bridgeport, Connecticut. Jones was alleged to be a leader of one of several groups that distributed drugs at Barnum. The government's evidence at trial consisted principally of testimony from law enforcement officers, cooperating coconspirators, and former members of rival drug organizations. The evidence, viewed in the light most favorable to the government, revealed the following.

### A. *Jones's Narcotics Operations*

In early 1997, several groups competed in the sale of narcotics near the entrance to the Barnum complex, an area known as D–Top. Jones and two of his nephews headed one group (the "Jones group"); Frank Estrada, who testified as a government witness at trial, headed another group (the "Estrada group"); a third group, headed by Eddie Pagan, was known as the "Foundation." In mid–1997, between two Barnum buildings, known as Middle Court, and exercised virtually exclusive control over narcotics sales in that area.

By mid–1998, Jones and his nephews Lonnie Jones (known as "LT") and Lyle Jones, Jr. (known as "Speedy"), employed several persons to distribute their drugs in Middle Court, providing prepackaged heroin and crack cocaine to lieutenants who delivered the drugs to street-level sellers and supervised the drug sales. Crack was sold principally under a "Batman" label; heroin, varying in levels of purity, was sold under a "No Limit" label used by Jones and under the labels "Most Wanted" and "Gotta Have It" used by Speedy and LT. Lawson Day, who had been employed as a seller by the Jones group, testified that despite the differences in brands, "Speedy's guys and Luke's guys all run together. They are all one team. Only difference is, Speedy just has a different name dope and crack and Luke has a different name dope and crack, but everybody is together." (Trial Transcript ("Tr.") 1644–45.) Similarly, Jones group lieutenant Kevin Jackson testified that Jones, Speedy, LT, and the lieutenants were a single group, simply "selling two different products." (Tr. 944.) David Nunley, who was first a lieutenant for Speedy and LT and thereafter a lieutenant for Jones, testified that regardless of which member of the Jones group he was working under, he sold that person's brand of heroin through the same group of street-level sellers.

The dealers worked on commission and were allowed to keep some 20 percent of the sales prices of the various drugs they sold. The lieutenants worked in shifts of eight hours each, usually supervising four or five sellers, and were generally salaried, earning $500 a week. The Jones group lieutenants were responsible for delivering the sales proceeds, minus the sellers' commissions, to Jones and/or his nephews. When the nephews were not available, the proceeds could properly be delivered to Jones, as it was all "their own." (Tr. 441.)

Sometime in 1998, Jones's brother Leonard Jones ("Leonard") began distributing narcotics in the D–Top area. Eddie Lawhorn, a member of the Estrada group, testified that Estrada, the Foundation, and Leonard divided the D–Top area among themselves. Estrada testified that he supplied cocaine to Jones, who then passed it on to Leonard for sale in the D–Top area. While there was testimony that Jones and Leonard often conferred in matters of trade, Leonard used different lieutenants and a largely distinct group of sellers, distributed narcotics under brands different from those used by the Jones group, and operated almost entirely in the D–Top area. On occasion, however, usually when the Jones group was short of crack, Leon-

ard's sellers were permitted to distribute crack in Middle Court.

## B. *The Use of Violence To Protect the Jones Group's Territory*

Jackson testified that there was an understanding among the various drug trafficking groups that only the Jones group's products were to be sold in Middle Court, and that sellers from other organizations were not allowed to sell there. Jackson testified that Jones and Jones's nephews used physical violence and intimidation to enforce that understanding and that if competitors disregarded that arrangement, they would "end up shot up, beat up, or whatever." (Tr. 944–45.) An associate of the Estrada group described an occasion in the summer of 1998 on which Jones, suspecting that one of his sellers had been robbed, approached the alleged thief with a loaded weapon, fired a shot into the ground, and threatened to kill him. The witness also described an occasion on which Jones beat up a rival who was attempting to sell an inferior-quality crack, misbranded as a product of the Jones group, in the Middle Court area.

Eugene Rhodes, another Jones group lieutenant in Middle Court, testified that he was "expected" to "shoot" or "smack ... up" any competitors in Middle Court. (Tr. 1181.) For example, sometime in 1998, Jones's nephew Speedy saw Foundation leader Pagan involved in an altercation in Middle Court. Speedy intervened and knocked Pagan unconscious. Anticipating retaliation, Rhodes, Speedy, and LT armed themselves with nine-millimeter semi-automatic firearms and awaited Pagan's return. Pagan returned some 30 minutes later, and Rhodes and Pagan exchanged gunfire; both were injured but survived the exchange. David Nunley testified that he spoke with Jones a day or so later about Speedy's altercation with Pa-

gan. Jones said the Jones group should protect themselves by being armed and wearing bullet-proof vests, and that "FD," a term used to refer to the Foundation, would soon mean " 'Found Dead.' " (Tr. 317–18.) David Nunley testified that members of the Jones group then drove through parts of the city where they believed Foundation members hung out, planning to "[s]hoot them." (Tr. 319.) And if members of the Foundation came through Middle Court, Jones group lieutenants were "supposed to .... [s]hoot them." (*Id.*) Jones himself saw Pagan driving through Middle Court and shot at Pagan's car with an AR–15 assault rifle, injuring a passenger.

### 1. *The Attempted Murder of Lawson Day*

In January 1999, Jones grew suspicious that Day, one of his sellers, was also working for the Foundation. Day, who considered himself "an associate of the [F]oundation" (Tr. 1627), testified that Jones approached him and asked "where [Day] stood" (Tr. 1629). Day responded that he was not " 'going to go against [Jones], but [was] not going against [the Foundation] either.' " (*Id.*) Rhodes testified that shortly thereafter, Jones group lieutenant John Foster was arrested, and Rhodes and another Jones group lieutenant, Willie Nunley (or "Willie"), met with Jones and Speedy, seeking to persuade them to put up Foster's bail. Jones and Speedy initially resisted. However, Jones commented that Day was a member of the Foundation group, and Speedy told Rhodes and Willie that if they " 'want[ed] to make some money, do Lawson Day' " (Tr. 1254), and that if they did, Foster would be bailed out.

Rhodes testified that that evening, when Day arrived at Barnum, Willie Nunley asked Day to assist Willie with a "hit," *i.e.,*

a murder. (Tr. 1258.) Day testified that he then drove Willie to a location near the supposed target, but that Willie then turned to Day, pointed a gun at him, and said, " 'You FD' " (Tr. 1633), which Day took as a reference to Day's association with the Foundation and to Day's imminent intended status as " 'Found Dead' " (Tr. 1634). Willie said, " 'I got to do it, got to do it.' " (*Id.*) Day pleaded with Willie to " 'do it quick, don't let me suffer,' " and Willie obliged as to timing, promptly firing three shots into Day's head. (Tr. 1634–35.) But Day survived, blinded in one eye.

### 2. The Murder of Anthony Scott

Following the shooting of Day, tensions intensified between the Foundation and Leonard's group, both of which continued to compete in narcotics trafficking at D–Top. One of Leonard's street dealers, Markey Thergood, testified that the Foundation, through a dealer named Anthony Scott, sold crack in the D–Top area in containers that looked similar to the crack containers used by Leonard. Leonard confronted Scott. And although Leonard indicated to Thergood that "nothing came about" as a result (Tr. 1704), in June of 1999 Leonard was shot in the face and told Thergood that there was "no doubt in his [Leonard's] mind" that Scott had been his assailant (Tr. 1708).

Shortly after Leonard was released from the hospital, Estrada group member Lawhorn overheard Leonard and Jones discussing the assault. Jones stated that he was "tired of playing with these kids," *i.e.*, members of the Foundation, and Leonard replied, " 'Make sure you get the right people.' " (Tr. 1508–09.) Thergood later encountered Jones, Speedy, and LT and relayed to them Leonard's belief that Scott was responsible for the shooting. Jones responded, " 'It's already handled.' " (Tr. 1728.) A day or two later, while selling

narcotics at D–Top, Thergood saw Jones shoot Scott at close range, killing him. (*See* Tr. 1747, 1757–58.) Ricky Irby, a street-level seller for both the Jones group and Leonard, also witnessed the events and testified that he had seen Jones and another man firing weapons at Scott and had "[n]o doubt" that Jones was one of the shooters. (Tr. 2411–12.)

In addition, as discussed in Part II.D. below, the government presented evidence that in November 1998, Jones had shot and killed one Monteneal Lawrence, who had made offensive remarks to Jones's girlfriend.

### C. The Charges, the Verdicts, and the Rule 29 Acquittals

Jones and various others were eventually arrested and charged with numerous drug-related offenses. To the extent pertinent to this appeal, a Fifth Superseding Indictment charged Jones with, *inter alia,* conducting and participating in the affairs of a RICO enterprise, in violation of 18 U.S.C. § 1962(c) (Fifth S. Ind. Count One); RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (*id.* Count Two); participating in a conspiracy with Speedy, LT, Willie Nunley, Rhodes, Jackson, Foster, and several others from in or about January 1995 to on or about February 24, 2000, to distribute heroin, cocaine, and crack, in violation of 21 U.S.C. § 846 (*id.* Count Five); participating in a conspiracy with Leonard and Lance T. Jones ("Lance") from in or about January 1997 to on or about February 24, 2000, to distribute heroin, cocaine, and crack, in violation of § 846 (*id.* Count Six); use of a firearm in relation to the murder of Lawrence, in violation of 18 U.S.C. § 924(c)(1) (*id.* Count Seventeen); and use of a firearm in relation to the murder of Scott, in violation of §§ 924(c)(1) and (2) (*id.* Count Twenty–Three). The two RICO counts alleged numerous predi-

cate racketeering acts, including conspiring to traffic in heroin, cocaine, and crack cocaine, conspiring to murder persons associated with the Foundation, conspiring to murder Day, conspiring to murder Scott, and murdering Scott and Lawrence.

The Fifth Superseding Indictment and a Sixth Superseding Indictment also charged Jones with a number of violent crimes in aid of racketeering ("VICAR") in violation of 18 U.S.C. § 1959(a), to wit, VICAR conspiracy to murder Day (Fifth S. Ind. Count Eighteen), VICAR conspiracy to murder Scott (*id.* Count Twenty–One), VICAR murder of Lawrence (Sixth S. Ind. Count 1), and VICAR murder of Scott (*id.* Count 2). The government filed notice that, if Jones were convicted on either or both of the VICAR murder counts, the government intended to request the death penalty. The Fifth and Sixth Superseding Indictments were consolidated for trial. Jones was tried separately from his alleged coconspirators.

The jury found Jones guilty on Counts One, Two, Five, Six, Seventeen, Eighteen, and Twenty–One of the Fifth Superseding Indictment, and on Count 1 of the Sixth Superseding Indictment. With respect to Counts One and Two, the RICO counts, the jury found that Jones had committed the predicate racketeering acts of participating in narcotics conspiracies, murdering Lawrence, and participating in three murder conspiracies, to wit, the conspiracies to murder Day, Scott, and other Foundation members. In finding Jones guilty on Count Five, *i.e.*, conspiracy among Jones and others to distribute, and to possess with intent to distribute, drugs in Middle Court beginning in 1995, the jury found that that conspiracy involved at least 1,000 grams of heroin, 5,000 grams of cocaine, and 50 grams of crack. In finding Jones guilty on Count Six, *i.e.*, conspiracy among Jones, Leonard, and Lance to distribute,

and to possess with intent to distribute, drugs in the D–Top area beginning in 1997, the jury found that that conspiracy involved at least 1,000 grams of heroin and 50 grams of crack.

The jury found Jones not guilty on Count 2 of the Sixth Superseding Indictment (VICAR murder of Scott) and on Count Twenty–Three of the Fifth Superseding Indictment (use of a firearm in relation to the Scott murder).

Following the return of the verdicts, the district court granted Jones's motion pursuant to Fed.R.Crim.P. 29 for a judgment of acquittal on Count 1 of the Sixth Superseding Indictment (VICAR murder of Lawrence) and Count Seventeen of the Fifth Superseding Indictment (use of a firearm in relation to the alleged VICAR murder of Lawrence). The court found that there was insufficient evidence that the murder of Lawrence had been committed for the purpose of maintaining or enhancing Jones's position in the RICO enterprise. *See generally United States v. Dhinsa,* 243 F.3d 635, 671–72 (2d Cir.), *cert. denied,* 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001); *see, e.g., United States v. Concepcion,* 983 F.2d 369, 381–82 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

With respect to the six remaining counts on which Jones was convicted, the district court sentenced Jones principally to concurrent terms of life imprisonment on Counts One, Two, Five, and Six, and 10 years' imprisonment on Counts Eighteen and Twenty–One. This appeal followed.

## II. DISCUSSION

■ On appeal, Jones contends principally (A) that, on the RICO charges and the charge of VICAR conspiracy to murder Day, he is entitled to reversal and a judgment of acquittal on the ground that

the evidence was insufficient to sustain the verdicts of guilty on those counts; (B) that Counts Five and Six, both of which charged drug-trafficking conspiracy, were multiplicitous, and that one such count should be dismissed; and (C) that as to any count on which his conviction is not reversed or dismissed, he is entitled to a new trial on the ground (1) that his Sixth Amendment right to the effective assistance of counsel was violated by his attorneys' trial tactics, or (2) that the inclusion of the ultimately dismissed charges relating to the murder of Lawrence was unfairly prejudicial. Jones also contends that as to any count on which his conviction is affirmed, he is entitled to be resentenced in light of *Booker* and *Crosby*. The government, while disagreeing that Jones is automatically entitled to be resentenced, concedes that there should be a limited remand in accordance with *Crosby* to allow the district court to consider whether to resentence. For the reasons that follow, we find no basis for disturbing Jones's conviction on any count. We remand for consideration of resentencing in accordance with *Crosby*.

### A. *The Sufficiency Challenges*

▮▮▮▮] Jones contends that the evidence at trial was insufficient to support his conviction on Count Eighteen, *i.e.,* the VICAR conspiracy to murder Day, and his convictions on Counts One and Two, *i.e.,* the RICO offenses. "A defendant who seeks reversal of his conviction on the ground of insufficiency of the evidence bears a heavy burden." *United States v. Concepcion,* 983 F.2d at 382; *see, e.g., United States v. Best,* 219 F.3d 192, 200 (2d Cir.2000), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001). In considering such a challenge, we are required to view the evidence in the light most favorable to the government, deferring to the jury's evaluation of the credibility of the witnesses, its

choices between permissible inferences, and its assessment of the weight of the evidence. *See, e.g., United States v. Ceballos,* 340 F.3d 115, 124 (2d Cir.2003); *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). Crediting every inference that could have been drawn in the government's favor, we will reject a sufficiency challenge if " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Best,* 219 F.3d at 200 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in *Jackson))*. Given these standards, we conclude that Jones's sufficiency challenges lack merit.

### 1. *Evidence as to the Day Murder Conspiracy*

Jones contends that the evidence was insufficient to support his conviction for conspiracy to murder Day, arguing that there was no proof that he at any time agreed that Day should be killed. *See generally United States v. Rubin,* 844 F.2d 979, 983 (2d Cir.1988) ("The fundamental element of a conspiracy is unlawful agreement."). We reject his contention.

At trial, as described in Part I.B.1. above, Jones group lieutenant Rhodes testified that he and Willie Nunley were initially rebuffed when they attempted to persuade Jones and Speedy to bail Foster out of jail. Jones's response was to comment that Day was a member of the Foundation group—a seeming non sequitur; but Speedy followed up by saying that Rhodes and Willie could earn money— presumably towards Foster's bail—if they would "do" Day, and that Foster would be bailed out if they killed Day. The jury could infer from the course of this conversation that Jones in fact prompted the suggestion that Day be killed, and that all four of those present agreed.

In addition, Rhodes testified that when Willie stated, in response to the suggestion that Day be killed, that Willie could shoot Day with a nine-millimeter weapon used in a prior crime, Jones told Willie, " 'Don't use that' " because the authorities "could trace that back." (Tr. 1255.) The jury was easily entitled to view that comment as further confirmation that Jones agreed to the killing of Day and was concerned only that the killing not be traced back to the Jones group. Accordingly, we reject Jones's sufficiency challenge to his conviction on the Count Eighteen charge of conspiracy to kill Day.

### 2. Evidence Supporting the RICO Counts

■ In challenging his convictions on the RICO counts, Jones contends (a) that there was insufficient evidence to prove either the existence of the alleged RICO enterprise or his membership in such an enterprise, and (b) that there was insufficient evidence to prove several of the alleged acts of racketeering activity. Again, we disagree.

RICO makes it unlawful "for any person employed by or associated with any enterprise" to, *inter alia*, "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering activity is defined to encompass a variety of crimes, including those involving narcotics trafficking and murder. *See id.* § 1961(1). To establish a "pattern" of racketeering activity, the government generally must prove the commission of at least two related acts of racketeering activity within a span of 10 years. *See id.* § 1961(5).

■ The term "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or *group of individuals*

*associated in fact* although not a legal entity." *Id.* § 1961(4) (emphasis added); *see, e.g., United States v. Turkette*, 452 U.S. 576, 580–81, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Thus, the existence of an enterprise may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 583, 101 S.Ct. 2524; *see, e.g., United States v. Morales*, 185 F.3d 74, 80 (2d Cir.1999), *cert. denied*, 529 U.S. 1010, 120 S.Ct. 1282, 146 L.Ed.2d 229 (2000). Indeed, "an association-in-fact is oftentimes more readily proven by what it *does*, rather than by abstract analysis of its structure." *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir.1991) (internal quotation marks omitted) (emphasis in original), *cert. denied*, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).

In the present case, despite Jones's contention that the evidence showed only a "loose conglomeration or assorted alliances of convenience among alleged drug dealers, working in their own self-interest, and often at cross-purposes" (Jones brief on appeal at 60), the government's evidence was to the contrary, showing a relatively structured RICO enterprise, conducted over a substantial period of time. For example, Jackson testified that the lieutenants would typically obtain prepackaged heroin and crack and would deliver bundles of packets to street-level dealers. David Nunley testified that the lieutenants were responsible for supervising four or five sellers and for making sure that the dealers were adequately supplied with product. The lieutenants who worked under LT and Speedy worked eight-hour shifts; some were fired for tardiness or for generally slacking off (Rhodes testified that he got fired "quite often" and that "it wasn't unusual to get fired" (Tr. 1134)). The lieutenants were generally salaried at

$500 a week and were responsible for collecting the sales proceeds—minus the approximately 20 percent the sellers were entitled to keep for their services—and turning the proceeds over to the leaders of their undertaking. Clearly, the evidence was sufficient to permit the jury to find that there was an enterprise.

▮ Similarly, the evidence was sufficient to permit the jury to find that this drug-selling enterprise was run by Jones in collaboration with his nephews. The record included testimony that Jones, LT, and Speedy provided the drugs to the lieutenants; that the lieutenants used the same group of street-level dealers to sell the products of Jones and his nephews; and that if the nephews were not around, the lieutenants could deliver the net sales proceeds—even from the nephews' brands—to Jones. The evidence was also ample to permit the jury to find that Jones, LT, and Speedy, with Jones as the leader, collaborated in enforcing the enterprise's exclusive control over Middle Court. Jones wore a bullet-proof vest "[e]very day" (Tr. 1152), and he encouraged the lieutenants to wear such vests, to carry guns, and to shoot members of rival groups who attempted to sell drugs in Middle Court. For example, in a swift series of events involving Pagan, the leader of the Foundation, Speedy knocked Pagan unconscious in Middle Court; Speedy, LT, and Rhodes armed themselves against reprisal by Pagan; Rhodes and Pagan shot and injured each other; Jones expressed the view that "FD," a term previously used to refer to the Foundation, would soon also mean "Found Dead"; Jones group lieutenants proceeded to drive around the city looking for Foundation members to shoot; and Jones himself shot at Pagan's car with an assault rifle, injuring a passenger.

In addition, as discussed in Parts I.B.1. and II.A.1. above, Jones raised with Speedy, Rhodes, and Willie Nunley the suspected duplicity of Day, who Jones believed to have allegiance to the Foundation. And Jones cautioned against killing Day with a gun that could be traced back to the Jones group. That conversation, which led to the botched attempt on Day's life, could easily be interpreted as reflecting the mutual interest of Jones and his nephews in protecting the exclusivity of their joint control over Middle Court.

In sum, the government's evidence at trial was ample to permit the jury to find that Jones, LT, Speedy, Rhodes, Willie Nunley, and others were associated in fact and functioned as a continuing unit in a common endeavor, to wit, narcotics trafficking in the Middle Court area of the Barnum complex. The evidence was plainly sufficient to support findings beyond a reasonable doubt that an enterprise existed and that Jones participated in conducting it.

▮ Finally, Jones contends that his convictions on the RICO counts are flawed on account of insufficient evidence to prove several of the alleged predicate acts of racketeering activity ("RA"), to wit, those alleged as RA–8, RA–9, and RA–10A. We reject that contention, for even assuming insufficiency of the evidence with respect to certain of these acts, the submission to the jury of an alleged RICO predicate act that is legally insufficient is not a basis for reversal of the RICO conviction if we can determine beyond a reasonable doubt that the jury would have convicted on the RICO count even if the insufficient ground had not been submitted to it. *See, e.g., United States v. Paccione,* 949 F.2d 1183, 1197–98 (2d Cir.1991), *cert. denied,* 505 U.S. 1220 (1992).

The Fifth Superseding Indictment alleged against Jones a total of five racketeering predicates that were submitted to the jury: (1) RA–1 alleging alternatively

the Middle Court drug conspiracy (RA–1C) or the D–Top drug conspiracy (RA–1D), (2) RA–8 alleging the murder of Lawrence, (3) RA–9 alleging conspiracy to murder members of the Foundation, (4) RA–10A alleging conspiracy to murder Day, and (5) RA–11 alleging alternatively the murder of Scott (RA–11B) or conspiracy to murder Scott (RA–11A). The jury was properly instructed that in order to find Jones guilty on the RICO counts, it must find, *inter alia*, that the government had proven at least two racketeering acts.

Jones does not contend that the evidence was insufficient to support the jury's findings that the government had proven RA–1C, the Middle Court drug distribution conspiracy among Jones, LT, Speedy, Willie Nunley, Foster, Rhodes, and others; nor does he assert any insufficiency with respect to RA–11A, the conspiracy to murder Scott. Thus, two of the RICO predicate acts that the jury found proven are unchallenged. In addition, RA–10A, the conspiracy to murder Day, parallels the allegations of Count Eighteen, and in light of our conclusion in Part II.A.1. above that the evidence was sufficient to sustain the verdict of guilt on Count Eighteen, the evidence was necessarily sufficient with respect to RA–10A.

Thus, at least three predicate acts of racketeering activity, *i.e.*, RA–1C, RA–10A, and RA–11A, were sufficiently supported, and we are convinced beyond a reasonable doubt that the jury would have found a pattern of racketeering activity established even if RA–8 and RA–9 had not been submitted to it. Accordingly, we need not reach the question of whether the evidence was sufficient with respect to RA–8 and RA–9.

In sum, we reject all of Jones's challenges to the sufficiency of the evidence to support his convictions on the RICO counts.

*B. The Claim of Multiplicity*

■ Jones contends that Counts Five and Six of the Fifth Superseding Indictment, each of which alleged his participation in a drug distribution conspiracy, are multiplicitous, charging him with two offenses—instead of one—for what was essentially the same conspiracy. He argues that this multiplication of the charges against him violates his Fifth Amendment right to avoid double jeopardy, *see, e.g., North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (the Double Jeopardy Clause "protects against multiple punishments for the same offense"), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 802–03, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989), and he urges that either Count Five or Count Six should thus be dismissed, *see, e.g., Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985) (where a jury finds a defendant guilty of multiplicitous charges, the court should "enter judgment on only one of the statutory offenses"). In the circumstances of this case, we reject his contentions.

■ "An indictment 'is multiplicitous when a single offense is alleged in more than one count.'" *United States v. Roshko*, 969 F.2d 9, 12 (2d Cir.1992) (quoting *United States v. Nakashian*, 820 F.2d 549, 552 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987)). A claim of multiplicity cannot succeed, however, "unless the charged offenses are the same in fact and in law." *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir.2003).

■ "The gist of the crime of conspiracy ... is the agreement ... to commit one or more unlawful acts," *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942), and "multiple agreements to commit separate crimes

constitute multiple conspiracies," *United States v. Broce*, 488 U.S. 563, 571, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). However, the question of whether the evidence shows a single conspiracy or more than one conspiracy is often not determinable as a matter of law or subject to bright-line formulations. For example, although an agreement is essential, it is not necessary that each coconspirator have expressly agreed with—or even have known the identities of—all the other coconspirators in order for the jury to find that there was but a single conspiracy. *See, e.g., United States v. Martino*, 664 F.2d 860, 876–77 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). Changes in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy. *See, e.g., United States v. Vila*, 599 F.2d 21, 24 (2d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. Tramunti*, 513 F.2d 1087, 1106 (2d Cir.), *cert. denied*, 423 U.S. 832 (1975). On the other hand, "[t]he participation of a single common actor in what are allegedly two sets of conspiratorial activities does not establish the existence of a single conspiracy...." *United States v. Korfant*, 771 F.2d 660, 663 (2d Cir.1985); *see, e.g., United States v. Macchia*, 35 F.3d 662, 668 (2d Cir.1994) (the fact that there was "overlap with respect to a number of characteristics, including time frame, geographic locale, participants, and criminal objective" does not necessarily mean that there was but a single conspiracy); *United States v. Papadakis*, 510 F.2d 287, 296 (2d Cir.) ("there is no reason why people cannot enter into two separate criminal agreements more or less at the same time"), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

Where, as here, separate counts of a single indictment allege that the defendant participated in more than one conspiracy in violation of the same statutory provision, but allege that the conspiracies existed for different—albeit overlapping—periods of time, and that the defendant, in each alleged conspiracy, had different groups of coconspirators, the question of whether one, or more than one, conspiracy has been proven is a question of fact for a properly instructed jury. *See, e.g., United States v. Orozco–Prada*, 732 F.2d 1076, 1086 (2d Cir.), *cert. denied*, 469 U.S. 845 (1984); *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir.1980); *see generally United States v. Macchia*, 35 F.3d at 672–73 (Newman, then-C.J., concurring).

In the present case, the jury was properly instructed, and Jones does not contend otherwise. The court informed the jury, *inter alia*, that "[m]ultiple conspiracies exist where the evidence shows separate, unlawful agreements operating independently of each other to achieve distinct purposes"; that the fact that members of a conspiracy are not identical does not necessarily mean that there was more than one conspiracy; that "a single conspiracy does not transpose into a multiple one by a lapse of time, change in membership or a shifting emphasis on its locale of operations"; and that a single conspiracy may exist without each member of the conspiracy conspiring directly with every other member of the conspiracy. (Tr. 3054–55.) The court stated that the jury could find that any of the alleged conspiracies existed without finding that another alleged conspiracy existed. In sum, the jury was properly instructed that whether the government had proven that "there existed a single, unlawful agreement, many such agreements or no agreement at all is a question of fact" for the jury to decide. (Tr. 3055.)

Thus instructed, the jury found Jones guilty on both Count Five and Count Six. The evidence, discussed in Parts I.A. and II.A.2. above, was sufficient to permit inferences that Jones conspired with LT, Speedy, the numerous lieutenants, and the dealers to distribute narcotics in Middle Court (Count Five), and that Jones entered into a separate conspiracy with Leonard to supply Leonard with drugs for Leonard's independent operation in D–Top (Count Six). Accordingly, we find no merit in Jones's multiplicity challenge to his convictions on those counts.

## C. *The Claim of Ineffective Assistance of Counsel*

■■■ Jones contends that he is at least entitled to a new trial, arguing that his trial counsel rendered less than constitutionally effective assistance. He asserts principally that, contrary to his wishes— and thereby supposedly giving rise to a conflict of interest—his attorneys concentrated their efforts on defending him against the VICAR murders alleged in Counts 1 and 2 of the Sixth Superseding Indictment (the "death-eligible counts"), conceding his guilt on other charges of which he was not guilty, and "urged the jury to acquit only on the two death-eligible VICAR murder charges" (Jones brief on appeal at 25). We conclude that, although Jones's attorneys acknowledged that Jones had been a drug dealer, their arguments did not concede his guilt on any count—for he was not charged with the substantive offense of distributing—and did not violate Jones's Sixth Amendment right to the effective assistance of counsel.

Jones first raised his ineffective-assistance-of-counsel claim just before the start of his October 2003 trial. *See United States v. Jones,* 2004 WL 1575257, at *2 (D.Conn. Jan. 7, 2004) (*"Jones I"*). For nearly three years before that, *i.e.*, since October 2000, he had been represented by Charles E. Tiernan III, an experienced attorney whom he had initially retained and who was later appointed by the district court under the Criminal Justice Act to continue serving as his counsel. In May 2001, the court also appointed a second attorney, Robert M. Casale, who was experienced in defending against prosecutions that could result in the death penalty, to serve as co-counsel to Tiernan.

On or about Friday, October 3, 2003, the district court received a letter from Jones indicating, for the first time, that he was dissatisfied with Tiernan and Casale. Jones asserted that "an 'irreconcilable conflict of interest' existed between him and his attorneys,'" *id.* (quoting Letter from Jones to the court dated September 25, 2003, at 1), and he requested a continuance and the appointment of new counsel. On October 7, the scheduled date for the commencement of jury selection, the court began by asking Jones to elaborate on his dissatisfaction with counsel. Jones (who was already imprisoned on related gun charges) stated that his attorneys had not visited him sufficiently in prison to agree on an appropriate trial strategy or to defend him properly. The court denied Jones's requests for a continuance and the appointment of new counsel. Under further questioning from the court, Jones assured the court that he was not asking to proceed *pro se.*

After the trial began, Jones several times sought a mistrial. For example, during his counsel's opening statement to the jury, which included the statement that although the jurors might viscerally say to themselves that Jones was "responsible for" the death of Lawrence (Tr. 44), they would conclude analytically that that shooting was not in aid of racketeering as alleged in the Sixth Superseding Indict-

ment, Jones interrupted to object to any concession that he had killed Lawrence:

> MR. JONES: Your Honor, this is—this got to stop right here.
>
> THE COURT: Mr. Jones—
>
> MR. JONES: *Your Honor, I done told [Attorney Casale], I done told [my attorneys] I'm not 'fessing to these murders.* He's talking to the jury like I committed these murders, you understand? *I don't care if a million people come in here and say I kill these people, I'm not 'fessing to that.* I told you attorneys time and time again, and *this is what I was stressing to you.*

(*Id.* (emphases added).) The court promptly excused the jury from the courtroom, but before the jury could leave, Jones continued:

> MR. JONES: This is bullshit right here. He just convicted me, he just tell these people I kill the people. I don't get a fair trial. I told you, I stressed to you, we're not going to argue that.

(*Id.*) After the jury had left, Jones addressed his attorney:

> MR. JONES: You given these witnesses credibility to smash me out.
>
> MR. CASALE: You're wrong.
>
> MR. JONES: I'm not wrong. I told you, if you came and communicated with me—I want to defend myself.
>
> MR. CASALE: I told you yesterday—
>
> MR. JONES: No, you didn't tell me you are going to say that [i]n [a]n open argument. You asked me a couple questions about a few witnesses, that's what you asked me. You never told me, and I stressed to both of you all that *I would not have you going in this courtroom and argue that I killed these people.*
>
> MR. CASALE: I didn't say that.
>
> MR. JONES: That's basically what you just told them, you told them you all would have problems with this case.

(Tr. 45 (emphasis added).) Despite having said "I want to defend myself" (*id.*), Jones again assured the court that he was not asking to proceed *pro se* (*see* Tr. 49). Jones directed his counsel to move for a mistrial; counsel complied. The court denied the motion and warned Jones against further such outbursts. After the jury's return to the courtroom, the court also instructed the jury to disregard Jones's statements and reminded the jury that arguments by counsel are not evidence.

On the following day, after the government had presented police witnesses who testified to such matters as surveillances conducted at Barnum and prior police encounters with Jones while he and his nephews were wearing bullet-proof vests, Jones complained of his attorneys' failure to cross-examine those witnesses. He also complained that counsel had failed to make sure that he received transcripts of prior trials so that he could prepare for cross-examination. In those complaints, "Mr. Jones did not dispute counsel's ability," but "he moved for a mistrial based on ineffective assistance of counsel, because counsel had not been cooperative in meeting or corresponding with him in the pretrial stage, thus preventing him from communicating his wishes regarding the defense strategy." (Jones brief on appeal at 29.)

During the second week of trial, Jones presented himself at the start of one trial day in his prison garb, asking the court to allow him to be tried *in absentia* because his attorneys were rendering ineffective assistance. The court denied the request and allowed Jones time to change into street clothes before continuing to attend the trial. Toward the end of trial, Jones moved for a mistrial on the ground that he had given counsel a list of persons he wanted called as witnesses and that coun-

sel declined to call them. His motion was denied.

 Jones contends that this record shows that his attorneys had a conflict of interest and that he was denied constitutionally effective assistance of counsel. We disagree. " 'An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.' " *United States v. Schwarz,* 283 F.3d 76, 91 (2d Cir.2002) (quoting *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994)). The defendant's mere assertion, however, that his attorney is providing less than constitutionally effective assistance, which requires the attorney to defend his preparation and strategy, is not itself sufficient to create a divergence of the attorney's interests from those of the defendant. *See, e.g., United States v. Moree,* 220 F.3d 65, 71–72 (2d Cir.2000); *United States v. White,* 174 F.3d 290, 296 (2d Cir.1999). As the only basis asserted by Jones for his claim that his attorneys had a conflict of interest is that he and they disagreed as to tactics, he has not shown an actual conflict of interest. Nor has Jones called to our attention any basis for finding that his attorneys had a potential conflict of interest.

 We reject as well Jones's suggestion that the court should have granted his motion for the appointment of new attorneys. We review the denial of such a motion for abuse of discretion, *see, e.g., United States v. Doe,* 272 F.3d 116, 122 (2d Cir.2001), *cert. denied,* 537 U.S. 851, 123 S.Ct. 204, 154 L.Ed.2d 82 (2002), using a three- or four-factor test, to wit, "(1) whether defendant made a timely motion requesting new counsel; (2) whether the trial court adequately inquired into the matter; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense," *id.* (internal quotation marks omitted); and (4) if there was such a breakdown, "whether the defendant substantially and unjustifiably contributed" to it, *id.* at 123 (internal quotation marks omitted).

The district court found in *Jones I* that Jones did not satisfy any of these factors, and we see no error in its findings. Represented by Tiernan and Casale for some 2½–3 years, Jones did not move for new attorneys until just days before the scheduled start of trial. The court inquired into Jones's complaints prior to the commencement of jury selection; Jones provided no substantial basis for his motion; he elaborated only that counsel had not visited him in prison sufficiently to agree with him on trial strategy. Nor was there anything close to a total breakdown in communication. In its posttrial opinion in *Jones I,* the court stated that it had

> observed Jones communicating regularly with [his attorneys] in whispered conversations at the defense table from the first day of jury selection to the last day of trial. In fact, after the . . . incident in which Jones asked that the trial proceed with him in absentia, the court began keeping a log at the bench that memorialized each in-court communication between Jones and his counsel for the remainder of the trial.

2004 WL 1575257, at *4. On some days, the court observed more than 30 such conferences. *See id.* at *5. Jones has not challenged these findings, and we conclude that his contention that he should have been granted new counsel is without merit.

Finally, under the traditional standard established by *Strickland v. Washington,*

466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that as a result he suffered prejudice. Both prongs of this test must be met; Jones fails both.

It is clear that Jones's attorneys, in addition to bringing out the biases of the witnesses who were narcotics traffickers, testifying against Jones in the hopes of receiving lenient sentences for themselves, made certain strategic choices as to what to dispute at trial. These choices were based on the strength or weakness of the government's evidence on various elements of the individual counts.

For example, with respect to the alleged VICAR murder of Scott, the government presented the testimony of two witnesses, Irby and Thergood, who claimed to have seen Jones shoot Scott. Defense counsel disputed that Scott had been shot by Jones, cross-examining Irby, for example, to show that Irby's powers of observation had likely been impaired by the fact that he had used heroin several times on the day of that murder. (*See* Tr. 2418–20.) They also brought out that Irby had given a factually inconsistent report to police shortly after witnessing the crime (*see* Tr. 2504–06) and that he had stated that Speedy was present at the time of the crime, which a law enforcement witness essentially conceded was highly unlikely (*see* Tr. 2777–81). Jones's attorneys also elicited from the same law enforcement witness evidence that cast doubt on whether the description by Thergood of the Scott murder was consistent with the forensic analysis of that event. (*See* Tr. 2785–86.)

As to the charge of VICAR murder of Lawrence, Jones's proposed strategy of denying that he had shot Lawrence would have been doomed by the consistent testimony of two witnesses—Jackson and a visitor who was acquainted with Jones—who had watched Jones enter a room, pull out a gun, argue with Lawrence, and fatally shoot Lawrence at close range. Jackson also testified that, *inter alia*, after he drove Jones away from the scene of the shooting, Jones sought to conceal and disassemble the murder weapon. Defense counsel instead emphasized that there was no evidence that the shooting of Lawrence had anything to do with the drug distribution business, *see* Part II.D. below, and thus that there was insufficient evidence to permit a guilty verdict on Count 1 of the Sixth Superseding Indictment or Count Seventeen of the Fifth Superseding Indictment. Counsel's arguing that the government had not proven any enterprise-related motivation, rather than that it had not proven that Jones shot Lawrence, was unquestionably the sounder defense.

As to the non-VICAR counts, defense counsel's strategy took into account the government's overwhelming evidence of Jones's drug dealing. Thus, rather than insist that Jones was uninvolved in sales of narcotics at Barnum—a tactic that would surely have made the jury skeptical of any other defense contention, given the parade of coconspirators who testified—Jones's attorneys argued that Jones had not been a member of any conspiracy alleged in the Fifth Superseding Indictment. Thus, in the opening statement, defense counsel stated, "We don't dispute that Luke Jones was selling drugs in the P.T. Barnum housing complex," but argued that "he sold his own brand, had his own workers, had his own suppliers," and did not conspire with LT or Speedy to do business jointly. (Tr. 40.) Counsel pursued this line of defense through cross-examination of the government's witnesses, eliciting testimony, for example, that the brands of heroin distributed by Speedy and LT were differ-

ent from Jones's brand and that Jones hired David Nunley as a lieutenant only after LT had fired him. And although David Nunley testified that he sold Jones's and the nephews' respective brands of narcotics through the same street sellers and that the proceeds of the nephews' brands could properly be delivered to Jones, as it was all "their own" (Tr. 441), defense counsel got David Nunley to testify that "Luke and Jackson have a business separate from [LT's] and those other guys" (Tr. 420) and that "[t]he groups have their own Lieutenants" and "keep their own money" (Tr. 431). Counsel also got Jackson to testify that it was "fair to say" that Jones was not responsible for his nephews' brands of drugs and that there were "[t]wo separate products," "[t]wo separate operations; separate groups." (Tr. 1054.)

Defense counsel's acknowledgement that Jones had been a drug dealer in a separate operation was thus not a concession that Jones conspired with his nephews, as alleged in Count Five. Nor was there any concession on the RICO counts. Rather, counsel argued that "[y]ou can't lump them all together as one enterprise" (Tr. 41), that the notion that there was a RICO enterprise was a government "contorti[on]" that "we seriously dispute" (*id.*), and that "[i]f anything, these people are the antithesis of an enterprise" (Tr. 2921).

In sum, the factual premise for Jones's contention that he received ineffective assistance of counsel on the non-death-eligible counts because his attorneys "urged the jury to acquit only on the two death-eligible VICAR murder charges" (Jones brief on appeal at 25) finds no support in the record. We cannot see that counsel's performance fell below an acceptable professional level or that Jones suffered prejudice as a result of the assistance rendered.

 We also reject Jones's contention that traditional *Strickland* analysis does not apply. The cases cited by Jones, *e.g.*, *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal...."); *Government of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1435 (3d Cir.) (holding that these " 'fundamental' " decisions relate to the "objectives of the representation," that a client must make and an attorney must abide by), *cert. denied*, 519 U.S. 1020, 117 S.Ct. 538, 136 L.Ed.2d 423 (1996), are inapposite here in light of the foregoing demonstration that Jones's guilt never was conceded by counsel. A *Strickland* analysis must be applied even where there is an express concession of guilt that does not amount to a guilty plea. *See Florida v. Nixon*, 543 U.S. 175, 188–91, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).

### D. *The Claim of Retroactive Misjoinder*

 Jones also contends that he should have a new trial on the ground that the joinder of the count alleging VICAR murder of Lawrence with the other charges constituted "retroactive misjoinder." We disagree.

 "[R]etroactive misjoinder refers to circumstances in which the joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper." *United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 540 U.S. 985, 124 S.Ct. 502, 157 L.Ed.2d 378 (2003). "In order to be entitled to a new trial on the ground of retroactive misjoinder, a defendant 'must show compelling prejudice,' " *id.* at 181–82 (quoting *United States v. Vebeliunas*, 76 F.3d 1283, 1293

(2d Cir.), *cert. denied*, 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996)), such as prejudicial spillover, *see, e.g., United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994). In analyzing a claim of prejudicial spillover, we consider "(1) whether the evidence introduced in support of the vacated count was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts, (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong," *United States v. Hamilton*, 334 F.3d at 182 (internal quotation marks omitted).

We see no likelihood that there was any prejudicial spillover here. The evidence as to the murder of Lawrence, while inflammatory, was not substantially more so than some of the other evidence, such as the eyewitness descriptions of Jones's close-range shooting of Scott, or the medical witness's description of the results of the botched murder attempt on Day, which "ma[c]erated" Day's brain, giving it the "consistency of mixed yogurt" (Tr. 2123). It is unlikely that the evidence as to the Lawrence shooting influenced the jury to convict on any other count. Indeed, as to the charge of VICAR murder of Scott, the count that was closest to the Lawrence murder in legal theory, the jury found Jones not guilty. The jury's diverse verdicts reflected a careful parsing of the evidence.

Moreover, no spillover from the Lawrence murder count to the other counts of conviction was likely, given that the evidence as to the murder of Lawrence was discrete from the evidence on the other counts. Although the government alleged that Lawrence's murder was intended to maintain or increase Jones's position in the RICO enterprise, most of the witnesses who testified about the shooting of Law-rence could offer nothing to show that motivation because they had no discernable connection to the narcotics trafficking business that Jones and his coconspirators conducted. Those witnesses testified that the murder had in fact followed a drunken insult by Lawrence to Jones's girlfriend.

Jackson, a Jones group lieutenant who was the other witness who saw Jones shoot Lawrence, testified that he "didn't know" why that shooting had occurred (Tr. 1031). Jones told Jackson that the shooting of Lawrence had " 'nothing to do' " with Jackson (Tr. 1034), and Jackson in no way suggested that the killing of Lawrence was meant to enhance or would have had the effect of enhancing Jones's stature in the eyes of his lieutenants. To the contrary, Jackson feared that he himself would be killed by Jones "[b]ecause of what [Jackson] saw." (Tr. 1043.)

Lastly, the evidence on the other counts on which Jones was convicted was more than adequate. The evidence as to the existence of a RICO enterprise and as to Jones's participation in that enterprise and in the alleged narcotics conspiracies, for example, was, as discussed in Part II.A.2. above, overwhelming. In all the circumstances, we see no realistic possibility that the evidence as to the murder of Lawrence affected the jury in its assessment of the evidence on the other counts against Jones.

### E. *Sentencing*

 Finally, Jones contends that he is entitled to be resentenced because his sentences were imposed under the then-mandatory Guidelines regime that was subsequently invalidated in *Booker*, 543 U.S. at 244, 259, 125 S.Ct. 738. As Jones did not challenge the mandatory application of the Guidelines in the district court, his challenge is subject only to plain-error analysis. *See* Fed.R.Crim.P. 52(b); *United States v. Olano*, 507 U.S. 725, 732, 113

S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Crosby,* 397 F.3d at 115–17. In accordance with the procedures adopted in *Crosby,* 397 F.3d at 117, we remand in order to allow the district court to consider whether the sentence imposed on Jones would have been nontrivially different if, at the time of sentencing, the Guidelines had been advisory. In so remanding, we note our rejection of Jones's contention that the Ex Post Facto Clause prohibits the district court from imposing a sentence as high as the statutory maximum. *See United States v. Fairclough,* 439 F.3d 76, 78–79 (2d Cir.), *cert. denied,* 2006 WL 1527191, 74 U.S.L.W. 3703 (U.S. June 19, 2006).

## CONCLUSION

We have considered all of Jones's arguments on this appeal and have found in them no basis for disturbing his convictions. We remand to the district court for such further proceedings as may be warranted in accordance with the foregoing.