18-3561-cr
*United States v. Rosemond*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2019

(Argued: December 10, 2019     Decided: May 1, 2020)

Docket No. 18-3561-cr

UNITED STATES OF AMERICA,
*Appellee,*

*- against -*

JAMES J. ROSEMOND,
*Defendant-Appellant,*

DEREK ANDRE ENGLISH; RODNEY JOHNSON, also known as Rodney T.
Hibbert, Toree Johnson; RONALD ANDERSON; BRIAN MCCLEOD, also known
as Slim, Brian Connelly, Joseph King, Brian Conley, John A. Conley;
DERRICK GRANT; SHAWN WILLIAMS, also known as William Shawn; JASON
WILLIAMS,
*Defendants.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

* The Clerk of Court is respectfully directed to amend the official caption to conform to the above.

Before:

SACK, CHIN, and BIANCO, *Circuit Judges*.

---

Appeal from a judgment of the United States District Court for the Southern District of New York (Kaplan, *J.*), convicting defendant-appellant of murder-for-hire, conspiracy to commit murder-for-hire, murder through use of a firearm, and possession of a firearm during a murder-for-hire conspiracy, and sentencing him to imprisonment for life plus 30 years. On appeal, defendant-appellant contends that at trial he was deprived of his Sixth Amendment rights to autonomy and effective assistance of counsel because his lawyer conceded, over his objection, an element of the charged crime -- that he had hired individuals to shoot the victim -- while arguing that the government had failed to prove intent to kill the victim. Defendant-appellant also argues that the district court improperly admitted uncharged prior bad-act evidence under Federal Rule of Evidence 404(b)(1).

AFFIRMED.

---

> ELIZABETH HANFT, Assistant United States Attorney (Samson Enzer, Drew Skinner, and Karl Metzner, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for

the Southern District of New York, New York, NY, *for Appellee*.

MICHAEL E. RAYFIELD (Scott A. Chasin and Shai M. Silverman, *on the brief*), Mayer Brown LLP, New York, NY, *for Defendant-Appellant*.

CHIN, *Circuit Judge*:

In this case, defendant-appellant James Rosemond was charged with murder-for-hire, conspiracy to commit murder-for-hire, possession of a firearm during a murder-for-hire conspiracy, and murder through use of a firearm, in violation of 18 U.S.C. §§ 1958, 924(c)(1)(A)(iii), and 924(j). These charges stemmed from the death of Lowell Fletcher. The government alleged that Rosemond hired others to kill Fletcher, who had previously assaulted Rosemond's teenage son. At trial, Rosemond's counsel conceded in summation that Rosemond hired individuals to shoot Fletcher, but he argued that the government failed to prove that Rosemond intended for Fletcher to be killed. The jury was not persuaded, and it returned a guilty verdict. The district court eventually sentenced Rosemond to imprisonment for life plus 30 years.

On appeal, Rosemond argues that he was deprived of his Sixth Amendment rights to autonomy and effective assistance of counsel because his lawyer conceded that he hired individuals to shoot Fletcher over his objection.

He also argues that the district court improperly admitted uncharged prior bad-act evidence under Federal Rule of Evidence 404(b)(1).  For the reasons set forth below, we **AFFIRM**.

## *BACKGROUND*

### I.    *The Facts*

On appeal from a conviction following a jury trial, the "facts are drawn from the trial evidence and described in the light most favorable to the government." *United States v. Wilson*, 709 F.3d 84, 85 (2d Cir. 2013).

### A.    *The Feud*

Rosemond owned Czar Entertainment ("Czar"), a Manhattan-based music management company that represented hip-hop, rap, and R&B artists. Czar's office was located across the street from a rival record label, Violator Records ("Violator").  From as early as 2002, when Rosemond paid his associate Derrick Grant "half a kilo of cocaine" to shoot the awning on Violator's office building, App'x at 1004, the two music companies were engaged in a contentious, often-violent rivalry.[1]  In 2003, Rosemond himself shot a parked car

---

[1]    Rosemond also ran a drug business, which, at its peak, involved ten individuals and sold as many as 70 kilograms of cocaine per week.

that belonged to Violator owner Christopher Lighty because Lighty was slow to return Rosemond's phone calls.

The rivalry intensified in February 2005. At that time, Czar represented rapper Jayceon Taylor, also known as "The Game." Despite being individually represented by Czar, Taylor was a member of G-Unit, a rap group managed by Violator and run by one of G-Unit's members, Curtis Jackson, also known as "50 Cent." While appearing as a guest on Hot 97, a New York-based radio station, Jackson insulted Taylor and ousted him from G-Unit. After hearing this transpire on the radio, Rosemond directed Mohammed Stewart, a Czar associate, to accompany Taylor to the Hot 97 studio to confront Jackson. When they arrived, Taylor, Stewart, and their entourage were shot at and retreated to Czar's office, but not before one of Taylor's friends was struck by a bullet. In retaliation, Stewart and one of his friends shot at the Violator building and were rewarded with a $2,000 payment, arranged by Rosemond.

The violence continued to escalate. In 2006, at an awards ceremony at the Apollo Theater in Harlem, New York, Rosemond got into an altercation with another G-Unit member, Marvin Bernard, also known as "Tony Yayo." Following a brief exchange in the lobby, several G-Unit associates followed

Rosemond and others to the mezzanine of the theater where the G-Unit associates pulled out a gun and threatened violence. Rosemond and his Czar associates left the theater and went into Khalil Abdullah's car. Abdullah, one of Rosemond's associates, called his friend and told him to bring over some guns. The friend complied, and when Bernard and his crew left the Apollo Theater later that night, Abdullah directed the friend to shoot at Bernard's car while Rosemond looked on. Abdullah later learned that a bullet struck a passenger in the vehicle.

On March 20, 2007, as Bernard and at least two other G-Unit associates -- including Fletcher -- were leaving Violator's office, they saw a 14-year-old boy wearing a "Czar" sweatshirt. The men confronted the boy by surrounding him, pushed him up against a wall, slapped him, and threatened him with what appeared to be a gun. The boy was Rosemond's son. Later that day, after Rosemond learned what happened, he and a group of Czar associates were gathered outside of Czar's office when they saw Lighty's brother walking by. Stewart wanted to exact some immediate revenge on Rosemond's behalf, and, using a razor provided by Rosemond, slashed Lighty's brother in the face.

More violence ensued, as Rosemond continued to commit and order violent acts against G-Unit. In April 2007, Rosemond shot at Bernard's mother's house while several of Bernard's family members, including a baby, were inside. In early 2008, Rosemond paid Stewart to shoot at a Violator associate's house in Staten Island. Other Czar acts of violence included throwing a Molotov cocktail at a G-Unit associate's truck, attempting to shoot Jackson, hiring an arsonist to burn one of Jackson's cars, trying to lure Lighty to a restaurant where he would be shot, and shooting at a van filled with G-Unit associates in an attempt to "make it a coffin." App'x at 311.

Rosemond told an associate he did not plan to stop until somebody was killed. In September 2009, someone was killed.

### B. *The Murder-for-Hire Conspiracy*

Brian McCleod met Rosemond in jail in the late 1990s. While there, McCleod introduced Rosemond to Grant, and the three of them grew friendly. In 2002, after all three were released, Rosemond gave McCleod and Grant jobs at his music label, which was then called Henchmen Entertainment (and later became Czar). McCleod was hired to supervise the activity at the studio, and Grant was hired to accompany Rosemond to events and serve as "muscle."

App'x at 1003. In 2003, McCleod stopping working at the record label, but he remained in contact with Rosemond. On August 9, 2004, McCleod received a call from Rosemond asking McCleod, in coded language, to go to an apartment in Queens to remove money and drugs. Shortly after McCleod arrived at the house, where there were 40 kilograms of cocaine and $450,000 in cash, he was arrested. McCleod did not cooperate with law enforcement or implicate Rosemond, and he was ultimately convicted and sentenced to a term of imprisonment.

McCleod spent a portion of his jail sentence at Mohawk Correctional Facility ("Mohawk") in Rome, New York. A month before McCleod was released, Fletcher was transferred from another prison to Mohawk. While there, he bragged about slapping Rosemond's son. McCleod did not reveal to Fletcher that he was connected to Rosemond. On August 10, 2009, McCleod was released from jail. A few days later, as partial payment for McCleod not cooperating with law enforcement, Rosemond arranged for McCleod to receive $5,000.

Shortly thereafter, McCleod met Rosemond in Central Park and told him he had "a line on the guy that slapped your son," App'x at 1028, indicating he knew an inmate still in prison with Fletcher. Rosemond said that he would

have paid $10,000 for someone to "cut" Fletcher in jail, App'x at 1029, and he expressed interest in Fletcher's whereabouts because he was having trouble sleeping ever since Fletcher assaulted his son.

Rosemond and McCleod met up again around a week-and-a-half later. They talked more about "the line" McCleod had on Fletcher, and Rosemond said: "I have $30,000 for anybody who brings him to me cause I'mma hit him so hard and so fast he's not gonna see it coming." App'x at 1034. After Rosemond said he was considering "doing this" himself, he asked for McCleod's thoughts. App'x at 1057. McCleod believed it was unwise for Rosemond to be involved in any violence himself, so he mentioned involving Grant. Rosemond instructed McCleod to see whether Grant would be interested. Grant was, but he wanted more than $30,000. McCleod agreed with Grant that a larger fee was required because the $30,000 was McCleod's fee for luring Fletcher to an attack, and Grant would need "at least twice that amount, if not more, maybe even close to a hundred [thousand dollars]" to be the shooter. App'x at 1068. McCleod then informed Rosemond that Grant was now involved in the plan.

McCleod learned from his contact in jail that Fletcher was being released on September 11, 2009. Rosemond instructed McCleod and Rosemond's

chauffeur -- Jason Williams -- to go to Long Island City, New York, where Fletcher would be released. After just missing Fletcher's release from jail, McCleod called Fletcher's lawyer, who happened to be with Fletcher.[2] The lawyer put Fletcher on the phone with McCleod, who introduced himself as "Slim," a friend-of-a-friend. App'x at 1076. McCleod pretended to want to help Fletcher land on his feet by offering him financial assistance. He also gave him his cell phone number. McCleod did this to earn Fletcher's trust so he would eventually be able to lure Fletcher to a location where he would be shot. When McCleod relayed his conversation with Fletcher to Rosemond, Rosemond ordered Jason Williams to give McCleod money to buy a new phone and instructed McCleod that the only person he should call from his new phone was Fletcher. Rosemond also inquired whether McCleod was "sure you [and Grant] can handle this?" App'x at 1083. McCleod said he was, and he bought the new phone using a fake name.

On September 25, 2009, McCleod met up with Rosemond. Rosemond showed McCleod an address in the Bronx where Fletcher was supposedly living and instructed McCleod to scope out the address to "[s]ee if

_____

[2] McCleod remembered that his contact at Mohawk shared a lawyer with Fletcher, and so he called that attorney to try to reach Fletcher.

something can be done up there." App'x at 1091. McCleod then proposed a code: if the location was good, McCleod would text Rosemond that he liked a girl; if it was not good, McCleod would text Rosemond that there was no chemistry. Rosemond agreed. After traveling to the Bronx and seeing several surveillance cameras in and around the building, McCleod told Rosemond via text that there was no chemistry.

The next day, on September 26, 2009, McCleod, Grant, and Jason Williams met and agreed on a location for the murder: Mount Eden Avenue in the Bronx, New York, between Inwood Avenue and Macombs Road. That night, McCleod called Fletcher, and, under the guise of receiving money and meeting some women, Fletcher agreed to meet McCleod the next day near the location McCleod, Grant, and Jason Williams selected. In coded language, McCleod relayed this information to Jason Williams and Rosemond. Rosemond said: "OK, have fun." App'x at 1134.

C.    *The Murder-for-Hire*

On Sunday, September 27, 2009, Jason Williams picked McCleod up and they drove to Mount Eden Avenue where they saw Rodney "Toree" Johnson and Shawn Williams parked in Johnson's car a few blocks away on the corner of

Mount Eden Avenue and Jerome Avenue. Rosemond sent Johnson and Shawn Williams as back-up shooters in case something went wrong. Jason Williams and McCleod drove two blocks over between Inwood Avenue and Macombs Road, and they saw Grant standing in the area where they agreed to kill Fletcher. Grant had a gun, which Rosemond had provided him. When Fletcher got off the train nearby, McCleod directed him toward Grant, who shot and killed him.

When Rosemond learned that Fletcher was killed, he reacted by saying: "OK." App'x at 867. He expressed no shock and no anger that Fletcher was dead. Instead, Rosemond told Jason Williams to get rid of the gun used to murder Fletcher, and he paid him $8,000 for his involvement in the scheme. In a separate reaction to the news that Fletcher was murdered, Rosemond told Czar associate Abdullah: "Yo, that bitch is out of here." App'x at 631.

On September 30, three days after the murder, McCleod asked Rosemond, in coded language, about him and Grant being paid for their involvement in the murder. Rosemond told him to be patient. Two days later, McCleod met Rosemond in person. Once again, Rosemond expressed no anger or disappointment that Fletcher was dead. Instead, he apologized for the delay in payment and instructed McCleod to meet up with Johnson, who had "a joint

for you." App'x at 1182. Rosemond instructed McCleod to split what Johnson gave him three ways, giving a third to Grant and a third to the guy from jail "that helped bring Fletcher to you." App'x at 1182. Later that day, McCleod met up with Johnson and another Czar associate named Brian James, and McCleod received a computer box containing a kilo of cocaine -- payment for the completed murder-for-hire.

## II. *Procedural History*

Rosemond and Johnson were tried together in February and March of 2014. Together, they faced seven counts, four of which related to the murder-for-hire and three of which related to the drug conspiracy. Because Rosemond was previously convicted and sentenced on similar drug charges, only Johnson faced drug charges in that trial. The jury convicted Johnson of the drug-related charges, but it failed to reach a unanimous decision on the murder-for-hire charges, resulting in a mistrial.

Rosemond was retried alone in December 2014, and he was convicted on four counts related to the murder-for-hire. He was sentenced to life plus 20 years' imprisonment. This Court vacated that conviction and sentence, however, on November 1, 2016, holding that the district court erred in

interpreting the scope of Rosemond's proffer agreement waiver. *United States v. Rosemond*, 841 F.3d 95, 110 (2d Cir. 2016). In particular, we found that the district court erred in precluding Rosemond from arguing that the government failed to prove an element of the charged crime -- that Rosemond intended for Fletcher to be killed. *Id.*

In November 2017, Rosemond was tried for a third time. In his closing argument, Rosemond's attorney, David Touger, acknowledged that Rosemond paid for Fletcher to be shot, but he argued that the government failed to prove beyond a reasonable doubt that Rosemond intended for Fletcher to be killed. Rosemond was convicted. Before being sentenced, Rosemond moved for a new trial. In support of this motion, Rosemond filed two affidavits stating that he disagreed with the "trial strategy" advanced by Touger both before and during trial. App'x at 1704-07. Rosemond noted that he did not raise this issue before the district court because his "understanding was that Mr. Touger had final authority about what trial tactics to pursue and what arguments to present to the jury." App'x at 1705. The district court denied Rosemond's motion and sentenced him to life plus 30 years' imprisonment. This appeal followed.

- 14 -

## DISCUSSION

On appeal, Rosemond argues principally that he was deprived of his rights to autonomy and effective assistance of counsel under the Sixth Amendment. He also argues that the district court improperly admitted uncharged prior bad-act evidence under Federal Rule of Evidence 404(b)(1). We address first the Sixth Amendment claims and then the evidentiary issue.

## I. *The Sixth Amendment*

### A. *Standard of Review*

"The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*." *Doe v. United States*, 915 F.3d 905, 910 (2d Cir. 2019) (citation omitted). Whether a defendant's Sixth Amendment right to autonomy has been violated is also a mixed question of law and fact, and thus we apply *de novo* review to that question as well. *See United States v. Read*, 918 F.3d 712, 719 (9th Cir. 2019).

### B. *Applicable Law*

The Sixth Amendment provides certain procedural safeguards to individuals who have been charged with crimes, *see Gannett Co. v. DePasquale*,

443 U.S. 368, 379 (1979), including the right to a speedy, impartial trial; the ability to call and confront witnesses; and, relevant here, "the Assistance of Counsel." U.S. Const. amend. VI.  A defendant who elects to be represented, however, does not "surrender control entirely to counsel."  *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018); *see also Faretta v. California*, 422 U.S. 806, 820 (1975) (Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant").  Rather, the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense." *DePasquale*, 443 U.S. at 382 n.10.

### 1.    *"Right to Autonomy"*

By retaining counsel, defendants necessarily relinquish some autonomy to their attorneys.  *See Taylor v. Illinois*, 484 U.S. 400, 418 (1988).  After all, "[t]he adversary process could not function effectively if every tactical decision required client approval."  *Id.*  "Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity of certain witnesses in advance of trial."  *Taylor*, 484 U.S. at 418.

- 16 -

Recently, however, the Supreme Court held that a defendant in a criminal case has a "protected autonomy right" -- that is, the "Sixth Amendment-secured autonomy" -- "to make fundamental choices about his own defense," including whether to persist in maintaining his innocence even in the face of overwhelming evidence of his guilt. *McCoy*, 138 S. Ct. at 1508, 1511.[3]

In *McCoy*, the defendant, Robert McCoy, was charged with three counts of first-degree murder and faced the death penalty. 138 S. Ct. at 1506. McCoy's attorney, Larry English, believed the evidence against his client was "overwhelming," and thus decided the best course of action was to concede that McCoy murdered the victims to try to avoid a death sentence. *Id.* Before and during trial, however, McCoy vehemently protested this strategy both to English in private and the court on the record. *Id.*

---

[3]     Prior to *McCoy*, the Supreme Court had never explicitly used the term "right to autonomy" in the criminal context. *See* Erica J. Hashimoto, *Resurrecting Autonomy: The Criminal Defendant's Right to Control the Case*, 90 B.U. L. Rev. 1147, 1152-55 (2010). The Supreme Court has long recognized, however, that an accused has the right to make certain decisions, particularly with respect to self-representation. *See Martinez v. Ct. App. of Calif.*, 528 U.S. 152, 160 (2000) ("[T]he *Faretta* majority found that the right to self-representation at trial was grounded in part in a respect for individual autonomy."); *McKaskle v. Wiggins*, 465 U.S. 168, 176-77 (1984) ("The right to appear *pro se* exists to affirm the dignity and autonomy of the accused."); *see also Faretta*, 422 U.S. at 834 ("The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction.").

At a hearing two days before trial, McCoy attempted to fire English as his attorney in part because English tried to convince McCoy to "cop out to three counts of first[-]degree murder." *McCoy* App'x at 455. At this hearing, English asked to be relieved as McCoy's attorney because he and McCoy had "an irrevocable disagreement between how to proceed in this case." *McCoy* App'x at 458. The court denied their requests to sever the attorney-client relationship.[4] *McCoy*, 138 S. Ct. at 1506. At trial, during English's opening statement -- but not in earshot of the jury -- McCoy again voiced his disapproval of English's representation to the court after English told the jury "McCoy was the cause of these individuals' death [sic]." *Id.* The judge, however, affirmed McCoy's attorney's authority to decide how to proceed, and McCoy was ultimately convicted on all three counts of first-degree murder and sentenced to death. *Id.* at 1507.

The Supreme Court granted certiorari to determine "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's

---

[4]      After the court ruled that English had to continue representing McCoy, English began explaining the crux of their disagreement -- that McCoy was insisting that English put forward a defense at the guilt phase of the trial. As English explained "that the evidence in this case is so overwhelming against Mr. McCoy," the judge cut him off and assured that English had the authority to decide how to try the case. *McCoy* App'x at 469. He also noted that English had "stated this [concern] on the record prior to this date." *McCoy* App'x at 469.

intransigent and unambiguous objection," *id.*, and it held that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty," *id.* at 1505. In addition to the well-established decisions reserved for the client -- including "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forego an appeal," *id.* at 1508 (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)) -- the Court clarified that a defendant also has the "[a]utonomy" to decide on "the objective of his defense," *id.* at 1505, 1508.

The Court in *McCoy* also held that a violation of a defendant's Sixth Amendment right to autonomy is structural error not subject to harmless error review; that is, once the error is established, the defendant is not required to show prejudice to be entitled to a new trial. *Id.* at 1511. Errors are structural "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* (quoting *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017)). Because conceding a defendant's guilt against his wishes prevents a defendant from controlling his defense and "the effects of the admission would be immeasurable," *id.*, violating the right to autonomy is *per se* harmful.

## 2. *Right to Effective Assistance of Counsel*

Although the Sixth Amendment refers only to "Assistance of Counsel," U.S. Const. Amend. VI, it guarantees the right to *effective* assistance of counsel, *see McMann v. Richardson*, 397 U.S. 759, 771 (1970) ("[D]efendants facing felony charges are entitled to the effective assistance of competent counsel."). To prove this right has been violated, a defendant must show (1) the attorney's representation "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

Courts reviewing ineffective assistance of counsel claims are "highly deferential," and must "strongly presume[]" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689-90. This presumption is overcome only if "counsel failed to act reasonably considering all of the circumstances." *Jackson v. Conway*, 763 F.3d 115, 152 (2d Cir. 2014) (internal quotation marks omitted). When analyzing whether an attorney's performance was objectively reasonable, courts must avoid "the distorting effects of hindsight" and consider the lawyer's perspective at the time the decision was made. *Id.* at

- 20 -

153. If the attorney made a strategic choice after thoughtful consideration, that decision will be "virtually unchallengeable." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).

One strategic choice a lawyer may make is to concede an element of the charged crime. Such a decision is "sound trial strategy" when the attorney does not concede his client's guilt. *United States v. Arena*, 180 F.3d 380, 397 (2d Cir. 1999), *abrogated on other grounds by Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003). It is also reasonable when there is "overwhelming evidence in the case." *United States v. Arnold*, 126 F.3d 82, 89 (2d Cir. 1997), *aff'd sub nom. Holloway v. United States*, 526 U.S. 1 (1999). Similarly, lawyers are permitted to admit their client committed certain acts while challenging whether those acts fit within the charged crime. *See, e.g., United States v. Jones*, 482 F.3d 60, 76-77 (2d Cir. 2006) (finding it was objectively reasonable for an attorney to admit his client shot the victim but argue the shooting was unrelated to a drug conspiracy).

Even if counsel's strategy is "professionally unreasonable," there is no ineffective assistance of counsel "if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The stronger the prosecution's case, the less likely it is that the defendant was prejudiced by his attorney's actions. *Garner v. Lee*, 908

- 21 -

F.3d 845, 862 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1608 (2019). When there is overwhelming evidence against a defendant, for example, counsel may make certain concessions without prejudicing the defendant. *See, e.g.*, *Arnold*, 126 F.3d at 89.

### C.    *Application*

#### 1.    *Right to Autonomy*

Rosemond argues that his right to autonomy was violated when his attorney, Touger, conceded that he hired McCleod and Grant to shoot Fletcher. He contends this right was violated because Touger admitted "guilt of criminal acts over Rosemond's express objection." Appellant's Br. at 35. We are not persuaded, for we conclude that the right to autonomy is not implicated when defense counsel concedes one element of the charged crime while maintaining that the defendant is not guilty as charged.

Throughout its opinion, the *McCoy* Court's use of the word "guilt" is explicitly limited to the charged crime. 138 S. Ct. at 1505 (stating that McCoy "vociferously insisted that he did not engage in the *charged* acts and adamantly objected to any admission of guilt" (emphasis added)); *id.* at 1509 ("When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of *the*

*charged criminal acts*, his lawyer must abide by that objective and may not override it by conceding guilt." (second emphasis added)); *id.* at 1510 ("[C]ounsel may not admit her client's guilt *of a charged crime* over the client's intransigent objection to that admission." (emphasis added)). The dissent understood the majority's opinion to be so limited, too. When explaining its understanding of "[t]he constitutional right that the Court has now discovered," it noted: "a criminal defendant's right to insist that his attorney contest his guilt with respect to all *charged offenses.*" *Id.* at 1514 (Alito, J., dissenting) (emphasis added).

The majority repeatedly made clear that its decision was meant to safeguard the "objective of [one's] defense," *see id.* at 1505, 1508-10, 1512, plainly stating that "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense," *id.* at 1505. Once a defendant decides on an objective -- *e.g.*, acquittal -- "[t]rial management is the lawyer's province" and counsel must decide, *inter alia*, "what arguments to pursue." *Id.* at 1508 (internal quotation mark omitted). Conceding an element of a crime while contesting the other elements falls within the ambit of trial strategy. *See, e.g., Jones*, 482 F.3d at 76-77; *see also Arena*, 180 F.3d at 397. The majority in *McCoy,* in fact, acknowledged as much. 138 S. Ct. at 1510 (noting that the case did not deal with "strategic

disputes about whether to concede an element of a charged offense" but were instead "intractable disagreements about the fundamental objective of the defendant's representation").  Thus, when a lawyer makes strategic concessions in pursuit of an acquittal, there is no *McCoy* violation assuming, of course, the defendant's objective was to maintain his non-guilt (as opposed to, *e.g.*, pleading guilty in return for a lighter sentence).

Though we are not bound by our sister circuits' decisions interpreting *McCoy*, they reinforce our conclusion.  *See, e.g.*, *United States v. Holloway*, 939 F.3d 1088, 1101 n.8 (10th Cir. 2019) (defendant's right to autonomy was not violated when attorney and defendant had "strategic disputes" about how to achieve same goal); *United States v. Audette*, 923 F.3d 1227, 1236 (9th Cir. 2019) (defendant's right to autonomy was not violated because he disagreed with his attorney about "which arguments to advance"); *Thompson v. United States*, 791 F.App'x 20, 26-27 (11th Cir. 2019) (defendant's right to autonomy is not violated because attorney conceded some, but not all, elements of a charged crime).  Thus, we hold that *McCoy* is limited to a defendant's right to maintain his innocence of the charged crimes.

Here, Rosemond and Touger shared the same goal: acquittal. In pursuit of that goal, Touger never conceded that Rosemond was guilty of the charged crimes; instead, Touger merely conceded one element as part of his strategy to argue that the government had failed to meet its burden to prove Rosemond intended for Fletcher to be killed, a necessary element to convict on a murder-for-hire charge. This was trial strategy, and Touger made the limited concession while zealously defending Rosemond's innocence. For example, he suggested Fletcher might have died because of gang violence unrelated to Rosemond, noted that the shell casings found on Mount Eden Avenue could have come from another gun, and questioned the reliability of the eyewitness. This is far different from *McCoy*, where the attorney immediately conceded that his client was guilty of the charged crime, 138 S. Ct. at 1506, and never explored arguments that could have led to acquittal. A lawyer's decision to make strategic concessions while maintaining that his client is not guilty of the charged crime does not violate a defendant's right to autonomy.

While it is true that Touger admitted that Rosemond committed *a* crime -- perhaps aiding and abetting an assault in the first-degree under New York Penal Law § 120.10 or conspiring to commit a kidnapping under 18 U.S.C. §

- 25 -

1201 -- he vehemently denied that Rosemond committed the charged crime.

Although there may be times where such a concession could expose a defendant

to additional, future criminal liability, there is no indication that that was the

case here. Moreover, as noted *supra*, we read *McCoy* as limited to a defendant

preventing his attorney from admitting he is guilty of the crime with which he is

charged. This understanding makes good sense, as a defendant's decision to

admit guilt to the charged crime is similar to the other defense-related decisions

the Supreme Court has listed as being within the defendant's province: whether

to demand a jury trial, whether to testify in one's own behalf, and whether to

appeal a decision. *McCoy*, 138 S. Ct. at 1508; *see also*, *e.g.*, *Jae Lee v. United States*,

137 S. Ct. 1958, 1969 (2017) (defendant retains right to reject a plea and proceed to

trial).

Finally, Rosemond's argument loses force when its nuance is

considered. In his affidavit to the district court in support of his Rule 33 motion

for a new trial, Rosemond affirmed that he did not want Touger to tell the jury he

paid to have Fletcher shot because he "viewed it as a concession that [he] had

committed an immoral and shameful act." App'x at 1705. Yet in the same

affidavit, Rosemond also revealed the trial strategy he preferred Touger adopt: "I

asked him to argue to the jury instead . . . that I had paid Brian McCleod only to bring Fletcher to me." App'x at 1705. In other words, Rosemond was comfortable admitting to the jury that he paid for a kidnapping, but he drew the line at paying for a shooting. Had Rosemond asserted his right to autonomy to prevent his attorney from conceding *any* crime because of the "opprobrium" that accompanies such an admission, *McCoy*, 138 S. Ct. at 1508, his argument might carry more weight. It loses its thrust, however, when he picks and chooses which crime he is comfortable conceding.

This is especially true when Rosemond's argument is considered alongside the evidence the government presented of his rampant involvement in criminal activity. The evidence at trial demonstrated that Rosemond ran a drug operation and was involved in a series of violent acts against a rival record company, many of which involved the use of guns and two of which resulted in individuals being shot. Indeed, Rosemond looked on when Abdullah had a friend shoot up a car filled with G-Unit associates, and he was disappointed when Stewart refused to shoot up a house because he saw individuals were inside. While avoiding the shame that comes with admitting to a criminal act can be a genuine concern, that concern seems highly unlikely here.

## 2. *Right to Effective Assistance of Counsel*

Rosemond argues that his attorney was ineffective because he conceded that Rosemond paid for Fletcher to be shot, even though Rosemond told his lawyer not to make that concession. Because Rosemond fails to show that this was objectively unreasonable or that he would have been found not guilty had a different argument been advanced, his ineffective assistance of counsel claim fails.

Touger explained in his affidavit that he thought it was "the best defense strategy" to concede that Rosemond directed others to shoot Fletcher because he did not think the government could prove that Rosemond intended for Fletcher to be killed. App'x at 1707. Rosemond conceded this was "trial strategy." App'x at 1705. Nevertheless, Rosemond contends that because none of the witnesses testified that he expressly ordered Fletcher to be shot, Touger was ineffective for *not* arguing that Rosemond only instructed that Fletcher be brought to him.

To the contrary, there was ample evidence supporting Touger's strategy to concede that Rosemond ordered a shooting. The government's key witness, McCleod, who participated in the conspiracy and lured Fletcher to be

shot, testified that Rosemond agreed to pay Grant to be the shooter. Moreover, Rosemond was in Miami when the shooting took place, which belies the notion that he merely wanted Fletcher brought to him as he was over 1,000 miles away the day he sent five men with two guns to confront Fletcher. Finally, Rosemond's reaction to the news that Fletcher was killed -- telling one of his trusted employees, "Yo, that bitch is out of here," App'x at 631, 643-44, and simply saying "OK" when McCleod first broke the news, App'x at 867 -- further demonstrated his intent that, at the very least, Fletcher be shot. Thus, Rosemond fails to prove that Touger's assistance fell below an objective standard of reasonableness, even though that strategy ultimately did not work. *See Bell v. Cone*, 535 U.S. 685, 698 (2002) (noting that "judicial scrutiny of a counsel's performance must be highly deferential" (alteration omitted) (quoting *Strickland*, 446 U.S. at 689)); *United States v. Caracappa*, 614 F.3d 30, 48 (2d Cir. 2010) ("Monday-morning quarterbacking is not a sport encouraged by the laws governing ineffective assistance claims.").

Moreover, as detailed above, there was ample evidence that Rosemond hired McCleod and Grant to kill Fletcher. There is no reasonable probability that the outcome of the case would have been different had Touger

argued that Rosemond paid $30,000 to have Fletcher, who was in New York, brought to Rosemond while Rosemond was in Miami. Rosemond, therefore, was not deprived of his Sixth Amendment right to effective assistance of counsel as his counsel's performance was neither deficient nor prejudicial to his defense.

## II.     *Evidentiary Rulings*

### A.     *Standard of Review*

It is well settled that because "a district court is in the best position to evaluate the evidence and its effect on the jury, its rulings on admissibility under Rule 404(b) will not be overturned on appeal absent a clear showing of abuse of discretion." *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992). Therefore, we will reverse a trial court's evidentiary rulings only if the judge "acted arbitrarily and irrationally." *Id.*

### B.     *Applicable Law*

"Evidence of a crime, wrong, or other act" is inadmissible to prove a defendant's criminal propensity. Fed. R. Evid. 404(b)(1); *see also Huddleston v. United States*, 485 U.S. 681, 685 (1988). We evaluate Rule 404(b) "under an inclusionary approach," and prior bad acts may be admitted "for any purpose other than to show a defendant's criminal propensity." *United States v. Garcia*,

291 F.3d 127, 136 (2d Cir. 2002) (internal quotation mark omitted). Evidence of prior bad acts is admissible to "inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not "any more sensational or disturbing" than the charged crime. *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019).

## C. *Application*

Rosemond argues that the district court abused its discretion by admitting evidence of prior bad acts for the purpose of "paint[ing] Rosemond as a violent criminal." Appellant's Br. at 42. He further contends that the amount of admitted evidence was excessive and prejudicial.

Before trial, the district court partially granted and partially denied the government's motion *in limine*. The lower court decided to admit prior bad-act evidence of several violent incidents between Czar and Violator that were in connection with, and led to, the murder-for-hire conspiracy. The district court also allowed evidence of uncharged narcotics trafficking acts.

We conclude that the district court did not abuse its discretion in admitting this evidence. First, the prior bad acts that were admitted provided the jury with context to understand why Rosemond paid to have Fletcher killed. They also provided background to show Rosemond sold narcotics, which demonstrated his ability to make payments -- in support of an element the government was required to prove to convict a defendant under 18 U.S.C. § 1958 -- in drugs. Second, these acts further explained the mutual trust between Rosemond and the other conspirators, illustrating why Rosemond was comfortable involving these individuals in a crime where a conviction could result in life imprisonment or, worse, death. 18 U.S.C. § 1958(a). Third, Rosemond was charged with murder-for-hire, which is far more sensational and disturbing than the conduct admitted as prior bad acts. Thus, the district court did not abuse its broad discretion when it admitted the 404(b) evidence.

## *CONCLUSION*

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.