**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN, P. J., and BROWN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 8, 2021**

# In the Court of Appeals of Georgia

A20A2054. HARRIS v. THE STATE.

BROWN, Judge.

Following a bench trial, Dwayne Anthony Harris, Jr. was convicted of three counts of aggravated assault and a single count each of criminal attempt to commit armed robbery, possession of a firearm during the commission of a felony, possession of a firearm by a first offender probationer, and possession of methamphetamine. Harris now appeals from the denial of his amended motion for new trial, arguing that trial counsel's decision to concede Harris' guilt on the charge of possession of methamphetamine constituted a structural error, requiring Harris to receive a new trial. He also asserts ineffective assistance of counsel based on counsel's decision to concede guilt on the methamphetamine charge and counsel's misunderstanding of the

mens rea element of possession of a controlled substance. For reasons explained more fully below, we find no error and affirm.

On appeal from a bench trial, the defendant is no longer entitled to a presumption of innocence, and we therefore "view the evidence in favor of the factfinder's conclusion, giving due regard to the trial court's opportunity to judge witness credibility." (Citation and punctuation omitted.) *Mosby v. State*, 353 Ga. App. 744, 745 (839 SE2d 237) (2020). So viewed, the evidence shows that in the early morning hours of June 28, 2018, a female and two males were returning to the female's apartment after picking up food at Huddle House. As the trio approached the apartment, they were confronted by a man dressed in black, wearing a scarf covering his face and wielding a gun. The man pointed the gun at them and demanded, "give me everything you got." When the men responded that they did not have anything to give him, the gunman cocked the gun and waved the gun in their faces, and a scuffle between the gunman and one of the males ensued. The gunman struck the male in the head with the gun, the gun discharged, and the gunman fled the scene. The male struck on the head sustained a bleeding head wound that required treatment at a local hospital.

Following the male's release from the hospital, he and the female victim went to the police station to give statements, during which the female told police she recognized the gunman as a man named "Block."[1] Sometime after they left the police station, dispatch received a report of an incident involving one person threatening another with a gun and a car similar to the male victim's. Fearing the male victim might be confronting his assailant, the investigating officer responded to the scene, where he found the victim, who acknowledged he had been looking for Block. He also told the officer he had found and confronted Block, but Block fled the scene in his truck, which the victim described to the officer. The officer showed the victim a picture of Harris that had been posted on Facebook, and the male victim identified Harris as the man he knew as Block.

Based on the information provided by the male victim, law enforcement canvassed the area and located Harris asleep in his truck. After placing Harris under arrest, police impounded his truck and obtained a search warrant for the vehicle. During the execution of the warrant, police found clothing, including a black shirt, a red bandana, and a gun holster but no gun. Additionally, on the floor mat next to the

---

[1] The male victim admitted during trial that he did not tell police when initially interviewed that he knew the assailant as "Block" because he "was going to take the matter in[to his] own hands."

3

driver's seat, police found a small plastic bag containing a substance that resembled methamphetamine. Tests of the substance performed at the state crime lab showed that the plastic bag contained less than a gram of methamphetamine. When interviewed by police, Harris admitted that he sometimes went by the name Block, but he denied any involvement in the incident.

Based on the foregoing evidence, Harris was indicted for the crimes at issue. Against the advice of counsel, Harris waived his right to a jury trial, and the case proceeded to a bench trial. Immediately before trial, Harris declined a plea offer that would have required him to plead guilty to a single count of aggravated assault, the charges related to possession of a firearm, and possession of methamphetamine, in exchange for a ten-year sentence, with two years to be served in incarceration. Trial counsel later testified at the motion for new trial hearing that when he communicated the State's offer to him, Harris "was adamant that he couldn't take it because he couldn't come out here and admit to something he did not do."

At trial, the female victim testified that at the time of the incident, she was familiar with a man she knew as "Block" because he was an associate of the injured male victim. She further explained that during the scuffle, the gunman's face covering

4

fell off, and she recognized him as Block. Additionally, she identified Harris in court as the assailant.

The injured male victim testified that he and Harris were friends and saw each other "all the time." And the second time the gunman spoke to him, the victim recognized the voice as belonging to Harris. He also identified Harris in court as the man who assaulted and attempted to rob him.

Harris testified in his own defense and acknowledged that some people knew him as Block. Harris also admitted that he had in the past purchased drugs from the injured male victim, but he denied ever purchasing methamphetamine from the victim. Additionally, Harris denied any involvement in the assault and attempted armed robbery. Harris also denied possessing any type of handgun and claimed that on the night in question, he had been at the residence where the male victim attempted to confront him the following day.

According to Harris, at the time of the incident, he was working as a paid informant for the Monroe Police Department, and the injured male victim, the female victim, and the female victim's brother all sold drugs. Thus, Harris theorized that the victims learned the police had asked Harris to buy drugs from the male victim and his associates as part of a sting operation. Harris further speculated that after learning of

5

the planned sting, the victims falsely accused him of the attempted robbery, assault, and related crimes.

Harris denied ownership of the clothing found in the truck and the gun holster, explaining that the holster was in the truck at the time he and his father purchased the vehicle.[2] Additionally, Harris denied any knowledge of the methamphetamine found in the truck, stating that if the substance at issue was methamphetamine, it belonged to someone other than him. Harris opined that the methamphetamine could have fallen out as some unidentified person exited the truck, but "since [he] was in the truck, [he] was going to take responsibility for it."

During closing argument, defense counsel argued that the State had failed to prove beyond a reasonable doubt any crime other than possession of methamphetamine. With respect to the crime of possession, trial counsel conceded Harris' guilt, acknowledging that the methamphetamine was found in a truck over which Harris had sole control.

---

[2] Harris confirmed during his testimony that the truck belongs to his father.

Following closing arguments, the judge found Harris guilty of each of the charged crimes[3] and gave a detailed explanation of the evidence on which the court based its verdict. With respect to the charge of possession, the trial court stated:

> [T]he defendant and everybody acknowledges and I'm so finding that [Harris is] clearly guilty of possession of methamphetamine . . . . I mean, [the methamphetamine] was at his feet when [police] drove up [to his truck]. [Harris] got out of the truck, and [the methamphetamine] was found [on] the driver's side in the floorboard [and is] clearly visible in the photographs [taken at the scene and introduced into evidence].

The court sentenced Harris to 30 years, with 10 years to be served in confinement and the balance on probation. Harris then retained new counsel and filed a motion for new trial.

At the hearing on that motion, trial counsel testified that by the time of closing arguments, he felt that the trial had not gone well. He explained that neither he nor the State had anticipated the injured male victim appearing to testify as he had been "ignoring the subpoena[s]." And, trial counsel had not anticipated Harris testifying and tried to dissuade his client from doing so. Trial counsel further stated that he was

---

[3] The court merged two counts of aggravated assault with the count of attempted armed robbery for sentencing purposes.

7

not particularly concerned about the methamphetamine charge because it carried a maximum penalty of three years, and he believed that any sentence on that charge would be probated.[4] Instead, the attorney was focused on defending against the six remaining charges, at least four of which were violent felonies. Moreover, counsel was aware that the methamphetamine charge was unrelated in any way to the more serious charges at issue. Given these facts, and given the State's evidence on possession of methamphetamine, trial counsel decided that the best chance of minimizing Harris' prison time was to concede guilt on the drug charge and argue for acquittal or mercy on the remaining charges.

Trial counsel admitted that he did not discuss his decision to concede guilt on the charge of possession with Harris, explaining he made the decision "on the fly," after he got up and started his closing. Counsel acknowledged that at the time of trial, he did not understand that the State was required to prove not only that Harris possessed the methamphetamine, but also that Harris knew the substance in question was methamphetamine. Even knowing that the State was required to prove Harris was aware that the substance in his truck was methamphetamine, however, trial counsel

---

[4] The record shows that the trial court did, in fact, probate Harris' sentence for possession of methamphetamine.

still felt that conceding guilt on the methamphetamine charge presented the best possibility for lessening Harris' time in prison. Specifically, trial counsel pointed to the evidence related to the possession charge, which showed the methamphetamine was found in plain view in a vehicle where Harris was the sole occupant. Counsel further noted that there was no evidence that anyone else had equal access to the truck. In light of these facts, the attorney felt that making the concession would have increased his credibility with the court as he argued for acquittal or mercy on the remaining charges. Counsel explained that his decision to concede guilt on this one charge was a judgment call, based on the evidence presented at trial and on his 23 years of experience practicing law in the circuit where the trial was held.

Harris testified at the new trial hearing and stated that trial counsel never informed him of the plan to concede guilt on the methamphetamine charge and that Harris never gave trial counsel permission to concede guilt on that charge. Harris further stated that when he heard his attorney's closing argument, "[i]t was like a slap in the face," and it felt like trial counsel was throwing him "under the bus" and "working with the DA." Following the hearing, the trial court entered an order denying the motion for new trial, as amended. Harris now appeals from that order.

1. Relying on the United States Supreme Court's decision in *McCoy v. Louisiana*, ___ U. S. ___ (138 SCt 1500, 200 LE2d 821) (2018), Harris asserts that trial counsel's unilateral decision to concede Harris' guilt on the methamphetamine charge during closing argument violated his Sixth Amendment right to conduct his defense and automatically entitles him to a new trial. We disagree, finding that Harris' argument is based on too broad a reading of *McCoy*.

In *McCoy*, the Supreme Court held that it is unconstitutional and a structural error, requiring no showing of prejudice, for defense counsel to concede guilt over a defendant's "intransigent and unambiguous objection" to doing so. 138 SCt at 1507 (I), 1511 (III). The case involved a defendant charged with the first-degree murder of his estranged wife's relatives. Id. at 1505-1506 (I). Trial counsel believed that the evidence against his client was so overwhelming that absent a concession at the guilt phase of trial that the defendant was the killer, a death sentence would be impossible to avoid at the penalty phase. Id. at 1506 (I). When informed of counsel's strategy, the defendant explicitly instructed counsel not to make that concession, and instead insisted that counsel seek an acquittal. Id. Based on his dissatisfaction with counsel's strategy, the defendant also sought to terminate his representation, but the trial court denied the request. Id.

When trial counsel during his opening statement told the jury that, after hearing the State's evidence, "there was 'no way reasonably possible'" that it could reach any conclusion other than that the defendant had caused the victims' deaths, the defendant immediately protested, complaining to the trial court outside the jury's presence. *McCoy*, 138 SCt at 1506 (I). The defendant subsequently testified in his own defense, asserting his innocence and relying on an alibi defense that the Supreme Court described as "difficult to fathom." Id. at 1507 (I). Counsel again conceded the defendant's guilt during his closing argument, and the jury returned a guilty verdict on all three counts of first-degree murder. Id.

The Supreme Court ultimately concluded that the defendant was entitled to a new trial, reasoning that among the rights guaranteed to a defendant by the Sixth Amendment is the "[a]utonomy to decide . . . the objective of [his] defense," including whether the objective of that defense is to maintain an assertion of innocence even in the face of overwhelming evidence.[5] *McCoy*, 138 SCt at 1508 (II)

---

[5] The Court equated this "right to autonomy" with a defendant's right to decide "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." 138 SCt at 1508 (II) (A), citing *Jones v. Barnes*, 463 U. S. 745, 751 (II) (103 SCt 3308, 77 LE2d 987) (1983).

(A). And, the violation of a defendant's right to make such a choice constitutes a structural error not subject to harmless-error review.[6] Id. at 1511 (III).

Harris contends that his attorney's unilateral decision to concede guilt on the methamphetamine charge after Harris pleaded not guilty to the charges and "offered exculpatory testimony" unlawfully usurped his Sixth Amendment autonomy to decide the goals of his defense. We disagree. First, nothing in the Court's holding requires counsel to obtain the express consent of a defendant prior to conceding guilt. Indeed, the Court noted that its holding in *McCoy* is entirely consistent with *Florida v. Nixon*, 543 U. S. 175 (125 SCt 551, 160 LE2d 565) (2004), in which the Court previously held that an attorney is not per se ineffective for adopting a strategy to concede guilt, even if his client does not expressly consent to that strategy. *McCoy*, 138 SCt at 1509

---

[6] The Supreme Court explained that "[s]tructural error affects the framework within which the trial proceeds, as distinguished from a lapse or flaw that is simply an error in the trial process itself." (Citation and punctuation omitted.) *McCoy*, 138 SCt at 1511 (III). An error may be considered structural: (1) when the right violated "is not designed to protect the defendant from erroneous conviction but instead protects some other interest, such as the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"; (2) when the effects of the error "are too hard to measure, as is true of the right to counsel of choice"; and (3) when the error signals "fundamental unfairness," as when a judge fails "to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt." (Citations and punctuation omitted.) Id.

12

(II) (B). See *Nixon*, 543 U. S. at 191-192 (II). Thus, the absence of Harris' affirmative consent to conceding guilt does not alone entitle him to a new trial under *McCoy*.

Next, we cannot agree that a defendant's not guilty plea equates to an "intransigent and unambiguous objection" to conceding guilt. *McCoy*, 138 SCt at 1507 (I). As to Harris' "exculpatory testimony," we note that his testimony regarding the methamphetamine was conflicting; while he denied that the methamphetamine was his, he also testified that "since [he] was in the truck, [he] was going to take responsibility for [the methamphetamine]." Under these circumstances, we cannot say that trial counsel's concession of Harris' guilt on the methamphetamine charge violated Harris' "Sixth Amendment-secured autonomy" such that he is automatically entitled to a new trial.[7] Id. at 1511 (III).

2. Alternatively, Harris contends that he is entitled to a new trial because trial counsel rendered ineffective assistance by conceding guilt on the methamphetamine charge, failing to reasonably communicate with Harris about this strategy,

---

[7] We note that there is some uncertainty as to whether *McCoy*'s holding extends to non-capital cases. See, e.g., *United States v. Rosemond*, 322 FSupp.3d 482, 486 (S.D.N.Y. 2018) ("While the Court well understands Rosemond's contention that the narrow holding of *McCoy* should be extended beyond capital cases and that this question will be resolved in due course by appellate courts, there is no need to decide it here."), aff'd, *United States v. Rosemond*, 958 F3d 111 (2nd Cir. 2020). We assume without deciding that *McCoy* is not limited to capital cases.

13

contradicting Harris' trial testimony, and failing to understand the essential elements of the offense of methamphetamine possession. To prevail on his claim, Harris "must show both that his counsel's performance was professionally deficient and that, but for the unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. We need not review both parts of this test if [Harris] fails to prove one of them." (Citation and punctuation omitted.) *St. Germain v. State*, ___ Ga. App. ___ (___ SE2d ___) (decided January 14, 2021).

(a) "Although it is clear that [Harris'] lawyer misunderstood the [mens rea element of possession of a controlled substance],[8] it does not follow that this misunderstanding necessarily affected his strategic decision[ ] to [concede guilt on the methamphetamine charge]. If the lawyer reasonably would have made the same strategic decisions . . . it cannot be said that the mistake of law affected the conduct or performance of the lawyer." *Shields v. State*, 307 Ga. App. 830, 832-833 (1) (a) (706 SE2d 187) (2011). Here, trial counsel's testimony at the motion for new trial hearing shows that even absent counsel's misunderstanding, he would have conceded guilt on the methamphetamine charge in an effort to engender credibility with the

---

[8] "[T]he criminal intent required [for possession of a controlled substance] is intent to possess a drug with knowledge of the chemical identity of that drug." *Duvall v. State*, 289 Ga. 540, 542 (712 SE2d 850) (2011).

14

judge, possibly avoiding conviction on the more serious charges or lessening Harris' time in prison. And, we have previously held that "[i]t is not objectively unreasonable to concede guilt on a lesser offense in an effort to avoid conviction on a more serious charge." *Payne v. State*, 338 Ga. App. 677, 683 (2) (791 SE2d 451) (2016), disapproved of on other grounds, *Worthen v. State*, 304 Ga. 862 (823 SE2d 291) (2019). See also *Favors v. State*, 296 Ga. 842, 846 (4) (a) (770 SE2d 855) (2015). Given the evidence presented at trial, including Harris' own testimony as well as the fact that Harris consented to a bench trial, we cannot say it was an unreasonable tactic to concede guilt on the less serious methamphetamine charge. See *Payne*, 338 Ga. App. at 683 (2) (not deficient performance to concede guilt on fleeing or eluding police charge to be "credible" and to avoid convictions on more serious charges). Accordingly, Harris has not overcome the presumption of professional reasonableness to show deficient performance. See *Shields*, 307 Ga. App. at 832-834 (1) (a).

(b) As part of his claim that counsel was ineffective for conceding guilt on the methamphetamine charge, Harris takes issue with counsel's failure to consult with him regarding this strategy. We find this argument meritless. "[A]n attorney's failure to fulfill the duty to consult regarding trial strategy does not in and of itself constitute ineffective assistance." *Hendrix v. State*, 298 Ga. 60, 64 (2) (a) (779 SE2d 322)

15

(2015). "In the context of a failure-to-consult claim such as that alleged here, the defendant must establish that his counsel's failure to consult was prejudicial to his defense, i.e., that there is a reasonable probability that, but for counsel's failure to consult, the result of his trial would have been different." (Citation and punctuation omitted.) *Blackwell v. State*, 302 Ga. 820, 826 (3) (809 SE2d 727) (2018). To demonstrate prejudice here, Harris would have to establish a reasonable probability that, had counsel consulted with him, counsel would have opted not to concede guilt on the methamphetamine charge and that such a strategy would in reasonable probability have resulted in a different outcome. See id. In light of the evidence presented at trial and during the motion for new trial hearing, there is no reasonable probability that, even if counsel had consulted with Harris and consequently decided not to concede guilt on the methamphetamine charge, the judge's verdict would have been different. Accordingly, the trial court did not err in denying Harris' motion for new trial.

*Judgment affirmed. Dillard, P. J., and Rickman, P. J., concur.*